IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DONNA MARIE KING, | | |
| Plaintiff, | | |
| v. | | Case No. 10 C 5155 |
| SISTERS OF ST. FRANCIS HEALTH SERVICES, INC., d/b/a ST. JAMES HOSPITAL AND HEALTH CENTERS, and JANET TOKARCZYK, | | Hon. Harry D. Leinenweber |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' Motion for Summary Judgment in this racial discrimination and retaliation lawsuit. For the reasons stated herein, the motion is granted.

## I. BACKGROUND

In December of 2005, Defendant Janet Tokarczyk ("Tokarczyk"), as Director of Case Management for Defendant Sisters of St. Francis Health Services, Inc. ("St. James" Hospital) interviewed and hired Plaintiff Donna Marie King ("King"), a nurse, for the position of Case Manager at St. James. Tokarczyk, who is white, became the supervisor of King, who is African American. Thus began what was to become an extremely rocky relationship between King and a number of co-workers (both black and white) and supervisors at St. James.

The record documents problems beginning shortly after King's hire, but the parties' statements of material fact stick to the following events.

On March 10, 2008, King's co-worker Sue Griffin ("Griffin"), an African-American social worker, complained in an e-mail to Tokarczyk about King's "disruptive and inappropriate behavior," alleging that King inappropriately tried to act as her supervisor and made "demeaning and belittling comments and gestures toward me." She felt "harassed by her aggressive and confrontational behavior." Defs.' Mot. for Summ. J., Ex. C; ECF 39-3, PageID Nos. 235-238.

On March 12, 2008, King's co-worker Shauntel Bond ("Bond"), also African-American, complained in writing to superiors about several incidents involving King. The first was a heated March 7, 2008 argument between King and Griffin that was "causing a disturbance on the unit." Bond reported that the two had had similar heated exchanges on several occasions and that she had notified supervisors of each occasion. The memo also detailed a March 10, 2008 disagreement between Bond and King, and that Bond felt King "is aggressive and can't get along with anyone on the unit." It detailed another disagreement between Bond and King on March 11, 2008 that required another employee, "Jan," (presumably either Case Manager Jan Berry or Janet Tokarczyk) to intervene between the two. When "Jan" intervened, Bond complained to "Jan"

that King "had run ins with physicians, staff and myself on several occasions." Finally, the e-mail recounted a past "difficult time" King gave Bond when Bond asked her to remove her personal belongings from a break room and cabinets in the case management office. Defs.' Mot. for Summ. J., Ex. D; ECF No. 39-4, PageID Nos. 243-244. King attributes the problems with Bond to jealousy over a male doctor's attention toward King instead of Bond.

On March 13, 2008, King's coworker Nancy Honeycutt ("Honeycutt") reported in an e-mail to Tokarczyk that Honeycutt had received a complaint from an employee, Angela Bell ("Bell"), about King. Honeycutt reported that Bell, after King put her belongings in the staff lounge, mentioned to King that Bond had just removed stray items from the lounge in preparation for an inspection, and Bell suggested King do the same with her personal items. Bell reported that King replied, "I'd like to see that Mother Fu[ck]er [Bond] touch my stuff." (King denies she said that.) Bell also reported that King later screamed down the hall at Bell in regards to the incident. *Id.* Honeycutt, in the same e-mail, told Tokarczyk that King's co-workers had mentioned "Donna's unprofessionalism and her mistreatment of staff on a number of occasions." *Id*.

Sometime in early 2008, Tokarczyk met with King and the Vice President of Human Resources over King's behavior. King was

suspended for two days; she does not feel the suspension was racial discrimination.

Also some time in 2008, King says, Honeycutt told her of a racially tinged comment made by another employee, Debra Hagemaster ("Hagemaster"), about 3-South (the unit on which King worked) becoming "ghetto." King says she interpreted the comment to be a reference to the fact that three African Americans were now working on 3-South. She said she told Tokarczyk of the comment in 2008, shortly after Hagemaster reportedly made it, but that Tokarczyk made no response. Tokarczyk says King never mentioned it.

On November 19, 2008, Griffin again e-mailed Tokarczyk to complain about King's "continuous inappropriate and confrontational behavior." Griffin reported that not only hadn't things improved, but King "is now becoming more aggressive to the point that it is threatening." Specifically, she reported King stormed in and loudly confronted her for not taking her phone call. "I am concerned about the overall well being and safety of this environment. What will she do next?" Griffin wrote. Defs.' Mot. for Summ. J., Ex. C.; ECF 39-3, PageID Nos. 239-240. King says Griffin lied about her.

At approximately the same time as the November 2008 Griffin e-mail, the hospital's new Vice President of Human Resources, Janet Slaven-Allen ("Slaven-Allen") held a meeting with King and Tokarczyk and noted King had a history of attendance problems.

King does not dispute she had attendance problems and was suspended more than once for it. King does not know if the attendance suspension "was racism or if that was just being unfair." Pl.s' Resp. to Defs.' Statement of Material Facts 10. King admits that Slaven-Allen warned her in that meeting that if "anything else" happened, she'd be fired.

At that same meeting, King reported to Slaven-Allen that coworker Glen Rach ("Rach"), a staff nurse, had called her a "black bitch" two years before. Tokarczyk testified this was the first she had heard of this complaint, but King maintains she told Tokarczyk of the incident when it occurred, and Tokarczyk did not investigate, saying that it would be a he-said, she-said matter. King admits Rach apologized to her for the comment sometime after he made it and prior to King reporting it to Slaven-Allen.

Both Plaintiff and Defendants agree that Slaven-Allen instructed Tokarczyk to investigate the incident, even though it was two years old. Tokarczyk did, and Rach denied making the "black bitch" comment, although he admitted he had gotten into a screaming match with King at the time and apologized to her shortly after the argument for raising his voice.

King's friend, Debra Wigfall ("Wigfall"), testified she witnessed Rach's apology and that Rach later confided to Wigfall that he had called King a "black bitch." Rach denies this. Rach also testified he once saw King standing over Griffin, screaming at

her about job performance with her fist clenched. King denies this.

King admits having difficulties, at unspecified times, with co-worker Jan Berry ("Berry"), requiring Tokarczyk to hold a meeting with the two so that they could work better together. King further admits having difficulties with another co-worker, Debra Hagemaster, which also required Tokarczyk to bring the two together for a meeting.

On March 3, 2010, King arrived late to a department staff meeting. She was late because she stopped at the cafeteria for cabbage and had to wait for bacon to be prepared to go with her cabbage. She eventually gave up on the bacon and proceeded to the meeting, arriving with a cup of water in one hand and the bowl of cabbage in the other. Her hands full, she knocked on the windowless door where the meeting was taking place. A co-worker, Caryn Muirhead ("Muirhead"), opened the door, swinging it inward. King contends Muirhead, upon seeing her, pushed the door back upon her, causing King's water to spill on her arm. Muirhead said she merely opened the door and was unaware that water spilled on King. King's friend, Wigfall, who was present and witnessed the incident, says she is uncertain if Muirhead pushed the door toward King or just let go of it, activating its self-closing mechanism.

King complained to Tokarczyk, who was also at the meeting but did not witness the incident. Tokarczyk called King the next day

and asked King to document the incident.  Tokarczyk also gathered information from Wigfall, Muirhead and another meeting attendee, Linda Armellino.

On March 5, 2010, King sent Tokarczyk an e-mail titled "assault," copying King's home e-mail.  The e-mail complained of the door incident and of another incident where Jan Berry "angrily shoved [a] chart at me."  Defs.' Mot. for Summ. J., Ex. D; ECF 39-4, PageID No. 246.

Around this same time, two hospital employees (Griffin and Mary Dunn) complained to Tokarczyk that King was working at another hospital and calling off of work at St. James to do so.  King admits these employees made such complaints, and that Griffin even provided Tokarczyk a document listing King as an employee of Metro South Hospital.  Tokarczyk brought this information to Slaven-Allen's attention.

On approximately March 10, 2010, Tokarczyk, Slaven-Allen and King had a meeting.  They discussed the results of Tokarczyk's investigation of the March 3, 2010 door incident.  At the same meeting, Slaven-Allen asked King point-blank if she was working somewhere else.  King admits she lied and told Slaven-Allen she was not working elsewhere, when in fact she was.  Slaven-Allen and King agree that Slaven-Allen told King at the meeting that the "assault" e-mail was a serious charge and that Slaven-Allen felt as if King was setting the stage for an EEOC complaint.

King claims she told Slaven-Allen and Tokarczyk at the March 10, 2010 meeting that her treatment at St. James was about "black versus white, and white is always right at St. James." King claims Slaven-Allen told King she didn't like it when people played the "race card" and that the hospital was going to go "on the offensive." Slaven-Allen and Tokarczyk deny Slaven-Allen made these comments.

After the meeting, King sent Slaven-Allen and Tokarczyk an e-mail on March 10, 2010 titled "not assault," thanking both of them for meeting with her "this a.m." "This is the first time since I have been employed at St. James, I have felt that someone actually listened, was not quick to judge before hearing all sides. . . . You [Slaven-Allen] were a breath of fresh air and I felt a weight had been lifted off me." King now says this e-mail was disingenuous backpedaling on her part, because she felt Slaven-Allen's question about working elsewhere indicated Slaven-Allen was determined to fire her no matter what.

After the meeting, Slaven-Allen investigated the charge that King was taking off time from St. James to work elsewhere. She spoke with human resources personnel at Metro South, who confirmed King had attended an employee orientation session during the period of August 9-14, 2009, a time when King had taken Family and Medical Leave Act ("FMLA") leave from St. James. King admits this, but says she didn't realize it was a violation of St. James policy

because she didn't consider the half-hour orientation session to be work.

Curiously, although the record indicates both parties had King's Metro South time sheet for the period in question (August 9-15, 2009) as early as June 3, 2011, King was only deposed about the half-hour orientation, although the time card indicates she worked three full or nearly-full days at Metro South (August 10, 11 and 14, 2009) during the FMLA leave she took from St. James. Neither side addressed the additional hours on the time card until Defendants' reply brief, where they used it to discredit King's statement of facts that she did not work at Metro South during the FMLA leave period. Defs.' Reply 4.

In any event, Slaven-Allen, armed with the information she received in the phone call about the King's orientation session at Metro South, met with King again on either March 11 or 12, 2010 and confronted her about the orientation/FMLA leave issue. Slaven-Allen had intended to fire King at the meeting, but instead indicated she would only suspended her if King could present Slaven-Allen with evidence (a Metro South timecard, for instance) proving she had not been working at Metro South during that time. There is disagreement over whether King was fired then and there or only after she failed to produce the evidence, but both parties agree King failed to produce any such evidence and was, in fact, fired.

King filed a complaint with the Equal Employment Opportunity Commission (the "EEOC") on May 6, 2010 and received her right-to-sue letter May 19, 2010.  She filed suit on August 16, 2010.  King alleges racial discrimination against the hospital under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and against both defendants under 42 U.S.C. § 1981.  She also alleges retaliation against the hospital under Title VII and against both Defendants under § 1981.

## II.  **LEGAL STANDARD**

Summary judgment is appropriate when the evidence shows there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Brewer v. Bd. of Trs.*, 479 F.3d 908, 915-916 (7th Cir. 2007).  There is no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party.  *Id.*

## III.  **ANALYSIS**

### A.  **Racial Discrimination (Title VII and § 1981)**

Although § 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical.  *Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467, 1472 (7th Cir. 1993).

There are two methods of proving discrimination:  the indirect proof method and the direct proof method.  *Brewer*, 479 F.3d at 915.

## 1. Indirect Proof (McDonnell Douglas standard)

Under the indirect proof method, a plaintiff must first prove a prima *facie case* of discrimination by a preponderance of the evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This requires plaintiff to show that "(1) he is a member of a protected class; (2) his job performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated persons outside the class received more favorable treatment." *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 709 (7th Cir. 2011).

The Court can quickly dispense with the indirect proof analysis, because King fails on at least two prongs. While she is a member of a protected class, undisputed facts show that her job performance was nowhere near her employer's legitimate expectations. She admits: she was suspended more than once for multiple absences, she was suspended again for not being able to get along with co-workers, she lied to her employer when asked if she worked elsewhere, and she took FMLA leave to attend an orientation at another hospital. It matters not that she claims to believe that taking FMLA leave for a mere orientation was not inappropriate. An employee's subjective belief is irrelevant to an employer's legitimate expectation.

By her own account of the facts, King was what this Court can only characterize as an employer's nightmare, requiring constant

babysitting and interventions between her and other squabbling employees.  She argues she shouldn't have had to answer questions about outside employment because the hospital did not prohibit it. If this question had been asked in a vacuum, this argument might have some merit, but it is utterly laughable here for two reasons. First, not answering (or inquiring why an employer wants to know) and lying to an employer are two vastly different things.  The first may be acceptable in certain circumstances; the latter probably never is.  Further, in this instance, when the employer was receiving written documentation from other employees indicating Plaintiff was robbing Peter to pay Paul (or St. James to pay Metro South, as the case may be), the hospital was well within its rights to ask her about it.

King also never identifies a single, solitary similarly situated employee who received different treatment after St. James discovered he or she had (1) lied to them about working elsewhere and (2) took FMLA leave to work elsewhere.  In fact, King never identifies another similarly situated employee in *any* context.

King's *prima facie* case is non-existent.

## 2. *Direct Proof*

"To survive summary judgment under the direct method, [King] need[s] to present either direct evidence of discriminatory intent (such as an admission) or enough circumstantial evidence to allow a rational jury to infer that discriminatory intent motivated [her]

firing. Circumstantial evidence may include suspicious timing; ambiguous statements; behavior or comments directed at others in the protected class; and evidence that similarly situated employees outside the protected class received systematically better treatment." *Burnell*, 647 F.3d at 708 (internal citations omitted).

Clearly, there was no admission by Defendants here and no policy that was discriminatory on its face. As best the Court can tell, the sum total of Plaintiff's circumstantial evidence is that Tokarczyk failed to investigate the "black bitch" remark and the "ghetto" comment made by co-workers in, respectively, 2006 and 2008. These came four years and two years, respectively, prior to her firing. Plaintiff alleges no adverse employment action other than the firing. She concedes the suspensions for conflict with co-workers were not racially motivated, and concedes she does not know what motivated the suspensions for absences.

A seemingly stray workplace remark, particularly when not uttered by anyone in a decision-making capacity, may provide evidence of discrimination only if the remark is "related to the employment decision in question." *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 576 (7th Cir. 2003) (noting that derogatory comments cannot defeat summary judgment in favor of an employer unless they are both proximate and related to the employment decision in question, and rejecting summary judgment on basis of age-related comments made five months prior to the adverse job action). Here,

the two remarks were well more than five months away from the adverse employment action and are not evidence of discrimination.

But King also argues that it is Tokarczyk's failure to investigate the comments, rather than the comments themselves, that support an inference of discrimination. What this really is an underdeveloped hostile workplace argument. An employer's failure to investigate and correct racial discrimination can amount to a hostile work environment.

In order to find a hostile work environment, the conduct complained of must be severe or pervasive "so as to alter the conditions of the employee's environment and create a hostile and abusive working environment." *Hobbs v. City of Chi.*, 573 F.3d 454, 464-465 (7th Cir. 2009) (finding that supervisors' failure to investigate employee's claim of coworkers vandalizing her car, while reprehensible, was not enough to create a hostile work environment).

King admits that Tokarczyk investigated numerous complaints and reports of conflicts between her and other employees. She complains Tokarczyk disregarded two complaints. However, she admits that when the "black bitch" complaint came to the attention of Slaven-Allen, Tokarczyk's superior, Slaven-Allen had it investigated immediately. While this was hardly a prompt investigation (if it was indeed initially ignored by Tokarczyk), it was eventually addressed. Moreover, King admits that Rach had come

to her long before that and effusively apologized.  King admits she told him she had already forgiven him.  That is hardly the portrait of a hostile work environment.

Nor is Tokarczyk's alleged failure to investigate the second-hand "ghetto" comment a critical failure on Tokarczyk's part.  *See Whittaker v. Northern Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) (noting, in the sexual harassment context, that second-hand harassment not heard directly has a lesser impact on a plaintiff).

Certainly, the alleged comment is much less severe than the uninvestigated vehicle vandalism found not to create a hostile environment in *Hobbs*.  Plaintiff's cited cases on this point are not from this Circuit and also involve conduct much more severe than what is at issue here.

In *DeGrace v. Rumsfeld*, the lone African American in a firehouse routinely had his equipment broken by co-workers, was given the silent treatment, had co-workers refuse to ride on the same truck as him, and received three notes containing not only racial epithets, but threats that his co-workers would allow him to die in the next fire they were called to.  *DeGrace*, 614 F.2d 796, 799-800 (1st Cir. 1980).  *See also*, *Snell v. Suffolk County*, 782 F.2d 1094 (2d Cir. 1986) (documenting conduct including the exoneration of white police officers of racial discrimination charges despite photographic evidence of them in mocking Hispanic dress, minority officers subject to "daily" racial epithets,

minority officers being forced to urinate into containers after being locked out of bathrooms, the posting of minority "study guides" featuring children's puzzles, the posting of a picture of an African-American with a noose around his neck, and the likening of African-Americans with "game" fit for hunting). This Court is not suggesting that conduct need be that severe to rise to an actionable level; merely that Plaintiff's cited cases are distinguishable, and the conduct in evidence in this case does not rise to an actionable level.

Finally, King appears to argue that the firing itself was discriminatory. But by her own admission, it was not a discriminatory firing, but a retaliatory one.

> Q. So are you indicating that you were not fired for race discrimination but were fired for retaliation?
>
> A. I was – I was fired for speaking up against someone hitting me, pushing a door on me.
>
> Q. So . . . your testimony is that you were discharged in retaliation for speaking up about the events of the meeting of March 3rd . . . ?
>
> A. Right. And I did say this is white and black. I did say that. I said, this is black against white. White is always right here at St. James.

Defs.' Mot. for Summ. J. 12. While this may be evidence of retaliation, it is not evidence pointing to firing because of King's race. *See, e.g., Benuzzi v. Bd. of Educ.*, 647 F.3d 652 (7th Cir. 2011) (upholding dismissal of discrimination claims for lack

of evidence of racial animus by supervisors, but reversing summary judgment of retaliation claim because of a series of negative employment actions, each coming after engaging in a statutorily protected act).

The discrimination claims, both under Title VII and § 1981, and as to both to St. James and Tokarczyk, are not supported by any evidence in the record, and therefore summary judgment is appropriate.

## B.   Retaliation (Title VII and § 1981)

### 1.   Indirect Method

As Plaintiff notes, retaliation can also be proved by direct or indirect methods.  For the same reasons cited above (not meeting legitimate expectations of the employer and failure to identify a similarly situated employee), King cannot state a *prima facie* case, and her attempt to prove retaliation by the indirect method fails.

### 2.   Direct Method

"To avoid summary judgment on a retaliation claim under the direct method, [plaintiff] must produce evidence from which a jury could conclude:  that she engaged in a statutorily protected activity; (2) that she suffered a materially adverse action by her employer; and (3) there was a causal link between the two." *Benuzzi*, 647 F.3d at 664 (7th Cir. 2011).

"Informal complaint[s] may constitute protected activity for purposes of retaliation claims." *Davis v. Time Warner Cable of*

*Southeastern Wis., L.P.*, 651 F.3d 664, 674 (7th Cir. 2011) (finding protected activity in an employee's verbal complaint to superior of disparate treatment of white and black employees). Here, King's e-mail regarding the "assault" cannot be considered a protected activity. Nowhere in the Plaintiff's SOMF is there a link between this complaint and race or racial discrimination in any fashion. It was simply a complaint about yet another workplace squabble, albeit with a sensational title of "assault." But assault is not necessarily race-related, and nowhere does Plaintiff point to any evidence that this event was race related. To the contrary, King attributed it to the fact that Muirhead was a friend of Jan Berry, who did not like her. Pl.'s Resp. to Defs.' SOMF 19. (Plaintiff quibbles that that was just a postulated reason, but in the same response admits "I don't know what caused her to do it." *Id.*) Again, nowhere is race or racial discrimination suggested as motivating this "assault," and nowhere is there proof that, even if it did motivate it, was that supposed motivation communicated to supervisors by King.

The only activity remotely protected activity was King's complaint lodged in the meeting called to discuss the "assault." King reports she complained to Slaven-Allen and Tokarczyk that supervisors always sided with white employees in dustups with African-American employees. This could conceivably be protected

activity.  For argument's sake, the court assumes, without deciding, that the first element is met.

So too, is the second element.  Things don't get much more materially adverse than being fired.

The problem, however, is the third element, the causal link. It is undisputed that by the time King engaged in ostensibly protected activity (during the March 10, 2010 meeting), she was *already under investigation* for the double-dipping.  King admits that other employees had already brought Tokarczyk and Slaven-Allen written evidence that she was working elsewhere.  These same employees told Tokarczyk that King was improperly taking off time from St. James in order to work at that second job.  By King's own admission, then, she undercuts her argument that her bosses manufactured this issue.  She claims they investigated it with undue zeal as a result of the protected activity, but this is also undercut by her own admissions.  During the March 10, 2010 meeting, Slaven-Allen merely asked if she was working elsewhere, and King lied.  Faced with the conflicting evidence of written documentation that King was working elsewhere, and King's lie, it is not surprising that would prompt Slaven-Allen to place a call or two in short order to see who was telling the truth.

The fact that King was fired a day or two after complaining that her bosses more often believed whites does create a temporal proximity.  But "suspicious timing alone is rarely sufficient to

defeat a motion for summary judgment." *Silverman v. Bd. of Educ.*, 637 F.3d 729, 736 (7th Cir. 2011). Particularly here, where the investigation into King's fireable activities was already under way, the proximity is of even lesser impact.

While Slaven-Allen's decision to deal with both the assault issue and the investigation in the same meeting was perhaps not the wisest choice, there is no law requiring employers to suspend or put off investigations already under way because an employee raises a racial issue.

It is also not surprising that, according to the SOMF, when no racial issues had been raised prior to that meeting, but then were surprisingly introduced by King, Slaven-Allen remarked she thought she was being set up. Again, perhaps not the wisest decision, but certainly not evidence of retaliation where the wheels to investigate King were already in motion.

Moreover, King's infraction was not some minor transgression. It involved the enlistment (or deception) of a doctor to certify that she was medically unable to work, the scheduling of work elsewhere, and then lying to cover it up. FMLA was meant to be a way for the legitimately ill, pregnant or childcare challenged to avoid the dilemma of choosing between a job and physical recuperation, or between employment and having children. It was not meant to enable employees to pick which particular job they wish to attend on a given day, which is exactly what King did.

King committed what almost every employer would consider a fireable offense and her co-workers, tired of her antics, ratted her out.  Her bosses began an investigation and, when they did, King made a racially related complaint.  Her bosses continued with their investigation, uncovered the truth, and fired her.  No rational jury could find that, simply because an employee raised a racial issue in the midst of a legitimate investigation, there was a causal connection between protected activity and termination.

Because there is no causal link in this case, the motion for summary judgment on the retaliation claims are granted.

### IV.  <u>CONCLUSION</u>

For the reasons stated herein, the Defendants' Motion for Summary Judgment is granted in its entirety.


**IT IS SO ORDERED.**


_____
      Harry D. Leinenweber, Judge
      United States District Court

**DATE:** 5/11/2012